UNITED STATES DISTRICT COURT
DISTRICT OF CONNECTICUT

|  |  |  |
|---|---|---|
| ORGEST KRAJA, | ) | |
| | ) | |
| *Plaintiff,* | ) | Case No. _____ |
| | ) | |
| v. | ) | |
| | ) | |
| HUNG CAO, | ) | |
| Secretary of the Navy | ) | |
| | ) | |
| *Defendant.* | ) | July 14, 2026 |
| | ) | |
| | ) | |

**<u>COMPLAINT</u>**

**INTRODUCTION**

1.      Plaintiff Orgest Kraja, a veteran of the United States Navy, brings this action seeking judicial review of a December 3, 2025 decision by the Board for Correction of Naval Records ("BCNR"), currently overseen by Defendant Hung Cao, that violates Mr. Kraja's rights under the Administrative Procedure Act.

2.      During his service in the Navy, Mr. Kraja was subject to traumatizing events that ultimately led to a diagnosis, following his discharge from the Navy, of Post-Traumatic Stress Disorder ("PTSD").

3.      As a result of his then-untreated PTSD symptoms, and as a coping mechanism, Mr. Kraja engaged in a single instance of drug abuse, which was subsequently discovered in a Navy-issued drug screening, and served as the basis for his "Other than Honorable" discharge.

4.      In the years that followed Mr. Kraja's discharge, the miliary has recognized that many former service members' less than honorable discharge characterizations were issued in

error or constituted an injustice, particularly when the discharge was the result of misconduct related to PTSD or other mental health conditions.  In response, the Department of Defense ("DoD") has issued multiple guidance memoranda to the boards for the correction of military and naval records, directing them to grant requests to upgrade discharge characterizations when the misconduct is mitigated and outweighed by the service member's PTSD or other mental health condition, or when the punishment the service member received was disproportionate or fundamentally unfair.

5.    In accordance with this agency guidance, Mr. Kraja petitioned the BCNR to upgrade his discharge to an "Honorable" discharge and to amend his narrative reason for separation, separation authority, and separation code accordingly to reflect "Secretarial Authority."

6.    The BCNR did not adhere to the DoD guidance when evaluating Mr. Kraja's request and denied his discharge upgrade.

**PARTIES**

7.    Plaintiff Orgest Kraja is a veteran of the Navy.  He is a citizen of the United States and resides in Stratford, Connecticut.

8.    Defendant Hung Cao is the current Secretary of the Navy and is named as a defendant herein solely in his official capacity.  Through his role as Secretary, Defendant has the power to act through the BCNR to change any record of a former sailor when necessary to correct an error or remove an injustice.  This authority is conferred by 10 U.S.C. § 1552 and 32 C.F.R. § 723.1, *et seq*.

**JURISDICTION AND VENUE**

9.    This Court has subject-matter jurisdiction under 28 U.S.C. § 1331, as this action arises under the Administrative Procedure Act, 5 U.S.C. § 706.

10.    Venue lies in this district pursuant to 28 U.S.C. § 1391(e)(1)(C).  Plaintiff resides in the District of Connecticut, no real property is involved in the action, and Defendant Cao is sued in his official capacity as an officer of the United States.

**STATUTORY AND REGULATORY BACKGROUND**

*Military Discharges*

12.    Upon discharge, military personnel receive a Certificate of Release or Discharge from Active Duty—*i.e.*, the "Form DD 214"—that characterizes their "Character of Service" as Honorable, General (Under Honorable Conditions), Other than Honorable, Bad Conduct, or Dishonorable.  Forms DD 214 also contain a section entitled "narrative reason for separation" which explains why the service member is separating from military service, as well as fields for "separation authority" and "separation code" that correspond to the character of service and reason for separation.

13.    A veteran's Character of Service affects his or her eligibility for various benefits and support services administered by the U.S. Department of Veterans Affairs ("VA"), as well as benefits provided by states (*e.g.*, property tax exemptions, burial in state military cemeteries) and non-profit entities (*e.g.*, scholarships).

14.    Employers will often request to see a former service member's DD 214 in the course of the job application process. For example, federal government positions that have veteran preferences in hiring require the veteran to present his or her DD 214 to receive the

3

preference.

***Guidance Regarding the Standards for Discharge Review***

15. Following discharge, a former service member may seek to correct their military records, including by requesting changes to the Form DD 214 Character of Service, narrative reason for separation, separation authority, and separation code.

16. A former service member who wishes to correct his military records submits an application to the appropriate Discharge Review Board or Board for Correction for his branch of service. The appropriate board for a former member of the Navy separated more than 15 years ago is the BCNR.

17. The BCNR is the highest level of administrative review within the Department of the Navy. Its mission is to correct errors and remove injustices from Naval records.

18. On September 3, 2014, then-Secretary of Defense Chuck Hagel issued mandatory guidance (the "Hagel Memo") to the boards for correction of military and naval records, including the BCNR. The Hagel Memo instructed the boards to consider upgrades to discharges based on previously unrecognized PTSD, which the Secretary recognized was often not diagnosed until "decades after service was completed." Secretary Hagel acknowledged that in cases of undiagnosed PTSD, service records alone may be insufficient to show a "basis for mitigation in punitive, administrative, or other legal action" or a nexus between PTSD and "the misconduct underlying the service member's discharge."

19. The Hagel Memo instructed the boards to give "special consideration" to discharge upgrade applications founded upon PTSD diagnoses by the VA and "liberal consideration" to applications citing PTSD diagnoses by a civilian provider, and stated that when PTSD or related conditions "may be reasonably determined to have existed at the time of

4

discharge, those conditions will be considered potential mitigating factors in the misconduct that caused the under other than honorable conditions characterization of service."

20. On February 24, 2016, then-Acting Principal Deputy Under Secretary of Defense Brad Carson issued further mandatory guidance (the "Carson Memo") to "ease the burden for all Veterans seeking redress" and ordered all boards for records correction to "renew and re-double our efforts to ensure that all Veterans who have sacrificed so much in service to our great Nation receive all the benefits that the Supplemental Guidance [Hagel Memo] may afford."  The Carson Memo instructed the boards to conduct de novo review of prior decisions involving PTSD claims that had not benefitted from the guidance in the Hagel Memo.

21. On August 25, 2017, Rear Admiral A.M. Kurta, performing the duties of the Under Secretary of Defense for Personnel and Readiness, issued still further mandatory guidance to all boards for records correction (the "Kurta Memo").  The Kurta Memo noted that "invisible wounds. . . are some of the most difficult cases," that "standards for review should rightly consider the unique nature of these cases," and that the boards should ensure "fair and consistent standards of review."

22. The Kurta Memo reiterated that in-service misconduct may be excused by mental health conditions such as PTSD.

23. In addition, the Kurta Memo advised that misconduct itself may be "evidence of . . . PTSD."

24. The Kurta Memo listed examples of behaviors associated with PTSD and related conditions, including: "substance abuse; episodes of depression, panic attacks or anxiety without an identifiable cause; [and] unexplained economic or social behavior changes."

25. The Kurta Memo also clarified that, with respect to its guidance to military review

boards considering requests by veterans to modify their discharge status, unless otherwise indicated, its use of the term "discharge" included "the characterization, narrative reason, separation code, and re-enlistment code" pertaining to a service member's discharge.

26.    The Kurta Memo advised the boards that "[m]ental health conditions, including PTSD . . . impact veterans in many intimate ways, are often undiagnosed or diagnosed years afterwards, and are frequently unreported," and that "[m]ental health conditions, including PTSD . . . inherently affect one's behaviors and choices causing veterans to think and behave differently than might otherwise be expected."

27.    The Kurta Memo also advised the boards that "[a]n Honorable discharge characterization does not require flawless military service," and that in cases of PTSD, "some significant misconduct [may] be sufficiently justified or outweighed by the facts and circumstances."

28.    On July 25, 2018, then-Under Secretary of Defense for Personnel and Readiness Robert L. Wilkie issued additional mandatory guidance (the "Wilkie Memo") to all the boards following outreach efforts to inform veterans of their right to apply for discharge upgrades and records correction.  The Wilkie Memo instructs the boards to upgrade discharges when required to ensure "fundamental fairness."

29.    The Wilkie Memo also instructs the boards to consider factors such as positive post-service conduct, the length of time since misconduct, acceptance of responsibility and remorse, job history, and whether misconduct may have been youthful indiscretion, among others.

30.    Each of the four memos—the Hagel Memo, the Carson Memo, the Kurta Memo, and the Wilkie Memo—emphasize the need for adequate and consistent redress for veterans

whose deleterious discharges arose from misconduct caused by PTSD.

31.    The four memos constitute mandatory guidance that is binding on the Secretary of the Navy, acting through the BCNR.

***Procedural Protections at the BCNR***

32.    In adversely ruling on applications of former service members for correction of naval records, pursuant to 32 C.F.R. § 723.03(e)(4), the BCNR must provide applicants with "the grounds for denial . . . includ[ing] the reasons for the determination that relief should not be granted, including the applicant's claims of constitutional, statutory and/or regulatory violations that were rejected, together with all the essential facts upon which the denial is based, including, if applicable, factors required by regulation to be considered for determination of the character of and reason for discharge."

33.    The Secretary of the Navy has authority for final decisions of the BCNR, and the responsibility to oversee the operations of the BCNR.

## FACTUAL ALLEGATIONS

34.    Mr. Kraja was born in Korca, Albania, on July 11, 1980.  He spent his childhood living in Albania with his parents and sister before moving to Greece and then Italy.

35.    Mr. Kraja returned to Albania in 2002 or 2003 and enrolled in the Agricultural Business and Management program at the Agricultural University of Tirane, from which he graduated in 2007 with the equivalent of a bachelor's degree from a U.S.-based institution.

36.    In 2007, Mr. Kraja was selected through the green card lottery to receive permanent resident status in the United States and moved to Connecticut shortly thereafter.

37.    Mr. Kraja became a United States citizen in 2011.

*Mr. Kraja's Service in the United States Navy*

38.    Even before becoming a citizen, Mr. Kraja met with Naval recruiters with the hope of joining the Navy as a pilot.  At the recruiters' suggestion, Mr. Kraja joined as an enlisted sailor, and the recruiters promised to increase his enrollment rank to E3 because he had a college degree recognized by the Navy.  These steps, according to the recruiters, would put Mr. Kraja on the path to becoming a Naval officer and eventually a pilot.

39.    During basic training, Mr. Kraja received positive remarks on physical tests and graduated from the Naval Air Technical Training Center with honors and received a letter of commendation.

40.    Also, during basic training, Mr. Kraja was the subject of discriminatory treatment at the hands of his fellow trainees, who made derogatory comments about his mild accent and immigrant status and called him a "terrorist."  One of Mr. Kraja's roommates escalated this type of behavior to such an extent that superiors reassigned him to barracks away from Mr. Kraja.

41.    After completing basic training, the Navy informed then thirty-year-old Mr. Kraja that he had missed the age cutoff to become a pilot by two years.  At the time of his enlistment, the Naval recruiters never raised Mr. Kraja's age as a possible impediment to becoming a Naval pilot.

42.    After learning that he could not become a Naval pilot, Mr. Kraja decided to pursue a path to becoming an Intel Officer.  Mr. Kraja's application, however, was rejected because the Navy refused to recognize his degree from the Agricultural University of Tirane.

43.    Without a recognized college degree, Mr. Kraja could not become a Naval officer. Instead, he was stationed on the USS Carl Vinson (CVN 70) as an airman and deployed for the first time from November 30, 2010, through June 15, 2011.

44. As an airman, Mr. Kraja was responsible for assisting planes to take off and land on the flight deck. Many of these planes were flying missions in Iraq and Iran or were delivering supplies to troops stationed in those countries. Mr. Kraja's work on the flight deck was constant and stressful, as he often worked 12-hour shifts with little rest in between. When Mr. Kraja did have an opportunity to rest, he was only able to retreat to his quarters directly below the flight deck where he could still hear planes taking off and landing just above his head.

45. While working as an airman on the Vinson, Mr. Kraja witnessed a plane catch fire mid-air as it was approaching. That plane landed on the deck still in flames about sixty feet from where Mr. Kraja was standing.

46. A few weeks after that plane fire and crash, Mr. Kraja was almost struck by a plane that crash-landed on the Vinson's flight deck and skidded to a stop within twenty feet of him.

47. Mr. Kraja was also subjected to another close call when a plane caught fire on the Vinson's flight deck because of gasoline that was spilled prior to the plane's ignition. That fire spread rapidly to Mr. Kraja's work area and nearly burned him and others.

48. During his first deployment, Mr. Kraja worked hard and received positive evaluations.

49. Also during his first deployment, Mr. Kraja suffered an injury to his lower back, which progressively worsened. His condition deteriorated to the point where the Navy reassigned him from his role as an airman on the flight deck to the role of patrolman in the Military Police.

50. Mr. Kraja was deployed to the Persian Gulf for a second time from approximately March 2012 through early 2013. During his second deployment, Mr. Kraja witnessed a fellow

patrolman being struck by friendly fire. The patrolman sustained serious injuries but survived. Witnessing this incident left Mr. Kraja fearful of the harm he could suffer performing his job duties.

51. Also during his second deployment, Mr. Kraja continued to experience tremendous pain in his lower back. Though he received positive evaluations for his work as a patrolman and was recommended for a promotion, Mr. Kraja's back pain ultimately forced him to change positions again. He assumed a role in the armory instead, where he worked from June 2012, through February 2013.

52. As an armorer, Mr. Kraja was responsible for maintaining weapons and ammunition inventory for the Military Police. The armory itself was an incredibly small space (roughly 10 feet wide by 10 feet long) and was surrounded by large quantities of weapons and ammunition. Mr. Kraja shared the armory space with another individual at all times.

53. Mr. Kraja's fellow armorer routinely engaged in games of Russian Roulette while on duty. He would point guns at himself, Mr. Kraja, and others during these games. Mr. Kraja attempted to stop this behavior but was unsuccessful. Because of his co-worker's reckless behavior, Mr. Kraja constantly feared for his safety and the safety of others. Despite these untenable conditions, Mr. Kraja's superiors still considered him a good manager of the armory.

54. While working in the armory, Mr. Kraja's back pain intensified, and the stressors he experienced previously on the flight deck and later in the armory caused him immense distress. Looking for relief, Mr. Kraja used marijuana once, exclusively while on holiday leave, to self-medicate his undiagnosed psychiatric symptoms and for physical relief from back pain.

55. After a single use of marijuana, Mr. Kraja was drug tested. He learned that he had failed the test when he attempted to re-board the Vinson post- leave. As Mr. Kraja stepped

10

on the ship, he was stripped of his chevron, causing him great shame in the eyes of his fellow sailors.

56.    After the failed drug test, Mr. Kraja received a non-judicial punishment.  He was placed on restricted duty for 45 days, which required him to extend his duties another 45 days; his pay grade was reduced to E-3; and he was forced to forfeit $979.95 in pay for two months.

57.    Shortly after receiving this non-judicial punishment, Mr. Kraja was discharged effective February 8, 2013, with an "Other than Honorable" designation for "Misconduct-Drug Abuse."

### Mr. Kraja's Life After Discharge

58.    Following his discharge, Mr. Kraja returned to Connecticut and began searching for work to provide for his then-wife and young son.  Starting in 2016, he worked for Gordon Foods Service as a food salesman, but that employment terminated in 2018 because of poor performance that stemmed from Mr. Kraja's anxiety and inability to sleep.

59.    In early 2020, Mr. Kraja secured employment with Omni Natural, an indoor farming start-up company, and, today, he operates that business as a sole proprietor.  He grows specialty microgreens for consumption and sells them in bulk to local restaurants.

60.    When Mr. Kraja is not working, he spends time with his son, meditates, does yoga, reads, and exercises.

### Mr. Kraja's PTSD Diagnosis

61.    Mr. Kraja began to experience PTSD symptoms while in the Navy, and they have gradually worsened over time.  To this day, he experiences depression, anxiety, lack of sleep and a general feeling of unease.  Mr. Kraja also suffers from frequent nightmares, often about his

parents and son being killed on the flight deck of the Vinson.  Anger plagued Mr. Kraja and caused a strain on his family and marriage.

62.     Following his discharge from the Navy, in an attempt to relieve his PTSD symptoms, Mr. Kraja initially turned to alcohol and then to medical marijuana, for which he has a license.  He has also engaged in some talk therapy but has not found much relief from the same.  Those professionals, including a VA clinical psychologist, confirmed Mr. Kraja's symptoms were likely attributable to PTSD.

63.     Prior to his discharge from the Navy, Mr. Kraja was never screened for PTSD or treated for his underlying PTSD-related symptoms.

64.     In October 2018, Mr. Kraja was evaluated for PTSD at Psychological Health & Development Associates, LLC.  The evaluating provider found it was at least as likely as not that Mr. Kraja's PTSD condition resulted from in-service stressors.

65.     In September 2019, on at least one occasion, Mr. Kraja experienced PTSD symptoms so severe and overwhelming that emergency hospitalization was required for his own safety and wellbeing. He was ultimately released and has not experienced a similar incident since.

66.     In a March 5, 2020 decision, the Department of Veterans Affairs ("VA") determined that Mr. Kraja's PTSD diagnosis is service-connected and that he is 70% disabled as a result of his diagnosis. A 70% VA rating corresponds to "occupational and social impairment, with deficiencies in most areas, such as work, school, family relations, judgment, thinking, or mood" and includes symptoms such as suicidal ideation, panic, depression, impaired impulse control, and difficulty adapting to stressful situations, including work settings.

### *Mr. Kraja's Application for Discharge Upgrade*

67.     On May 27, 2020, with the assistance of counsel, Mr. Kraja filed an application for review of his discharge status with the Naval Discharge Review Board (the "NDRB").  The NDRB issued a decision on March 31, 2021, which changed Mr. Kraja's discharge status from "Other than Honorable" to "General (Under Honorable Conditions)" since the "totality of [Mr. Kraja's] service, which included two deployments and his promotion to Third Class, coupled with the documented post-service Mental Health diagnosis…warranted additional consideration in the determination of overall characterization of service."  Nonetheless, the NDRB declined to upgrade Mr. Kraja's status to Honorable because it "did not find [Mr. Kraja's] Mental Health diagnosis rose to the level that would completely absolve him of his misconduct" and declined to change Mr. Kraja's Narrative Reason for Separation and associated DD-214 fields, which continue to reflect "Misconduct – Drug Abuse."

68.     Then, on December 2, 2022, Mr. Kraja, again with the assistance of counsel, sought the NDRB's further review of his discharge upgrade application pursuant to the settlement in *Manker v. Del Toro*, 3:18-cv-000372-CSH.  In a decision dated March 21, 2024, the NDRB concluded that Mr. Kraja's discharge status would remain "General (Under Honorable Conditions)" because Mr. Kraja's "mental health did not prevent him from understanding the consequences of his actions or that he was willfully violating Navy policy." The NDRB further found that Mr. Kraja's PTSD "did not mitigate the underlying basis/misconduct for the discharge" nor did it "outweigh [his] assigned Discharge Characterization."

69.     On March 13, 2025, Mr. Kraja, aided by counsel, sought the BCNR's review of his discharge upgrade application.  Specifically, Mr. Kraja requested that the BCNR upgrade his DD214 to reflect an "Honorable" Character of Service and correct his Narrative Reason for Separation, Separation Code, and Separation Authority to reflect "Secretarial Authority."

70.     Mr. Kraja requested an upgrade on three bases:

a.  First, Mr. Kraja requested "liberal consideration" of his application, pursuant to Hagel and Kurta Memos, on grounds that his service-connected PTSD mitigates his one-time use of marijuana.

b.  Second, Mr. Kraja requested an upgrade on fundamental fairness grounds and with consideration of the totality of the circumstances, including the full breadth of his service and demonstrated good character thereafter, as articulated in the Wilkie Memo.

c.  Third, Mr. Kraja requested an upgrade since, had his discharge occurred today, his PTSD would have been detected contemporaneously and recognized as a contributing factor to his pre-discharge conduct.

71.     In support of his position, Mr. Kraja submitted his own statement, service records, various medical records (both in- and post-service) demonstrating his PTSD diagnosis and its connection to his service as well as the VA's decision granting service-connection for PTSD.

72.     On December 3, 2025, the BCNR issued its decision denying Mr. Kraja a discharge upgrade.  That decision is appended as Exhibit A hereto.

73.     The decisional document states that a "licensed clinical psychologist" reviewed Mr. Kraja's application and available records on July 14, 2025, and issued an advisory opinion to the BCNR.  Ex. A at 2.

14

74.     The decisional document further states that the licensed clinical psychologist rendered two conclusions.  First, that "[t]here is post-service evidence from the VA of a diagnosis of PTSD that may be attributed to military service."  And second, "[t]here is post-service evidence from the Petitioner that his misconduct may be attributed to PTSD or another mental health condition."  Ex. A at 3.

75.     The BCNR considered this advisory opinion "favorable" to Mr. Kraja's request for relief. Ex. A at 1.

76.     Nonetheless, the BCNR "concluded that there was insufficient evidence to support the argument that any such mental health conditions [claimed by Mr. Kraja] mitigated the misconduct that formed the basis of [his] discharge."  Ex. A at 3.

77.     More specifically, the BCNR found that Mr. Kraja's "record reflected that [his] misconduct was intentional and willful and demonstrated that [he was] unfit for further service." Ex. A at 3.

### *Mr. Kraja Was Harmed by the BCNR's Decision*

78.     The BCNR failed to apply the liberal consideration standards mandated by the Hagel and Kurta Memos, and, instead, in conclusory fashion, stated "there was insufficient evidence to support the argument that" Mr. Kraja's PTSD "mitigated the misconduct" leading to his discharge.  Ex. A at 3.

79.     The BCNR further failed to apply the liberal consideration standards mandated by the Hagel and Kurta Memos, as evidenced by its statement that "[e]ven if the Board assumed that [Mr. Kraja's] misconduct was somehow attributable to any mental health conditions…the severity" of Mr. Kraja's one-time use of marijuana "in [his] specific circumstances outweighed any and all mitigation offered by such mental health conditions." Ex. A at 3.

15

80.     The BCNR failed to explain how its decision comports with the Kurta Memo, which instructs that although "premeditated misconduct is not generally excused by mental health conditions, . . .  substance seeking behavior and efforts to self-medicate symptoms of a mental health condition" warrant consideration.

81.     The BCNR further failed to specify why, in Mr. Kraja's case, his one-time use of marijuana was so severe as to outweigh "any and all mitigation offered by his mental health condition," Ex. A at 3, when the Kurta Memo specifically instructs that marijuana use may be viewed "in the context of mitigating evidence, as less severe today."

82.     The BCNR failed to identify any specific circumstances or rationale to support its conclusion that Mr. Kraja's one-time marijuana use was so severe that it could not be mitigated by his in-service PTSD.

83.     The BCNR also denied that Mr. Kraja was entitled to relief under the fundamental fairness factors and through consideration of the totality of the circumstances, as dictated by the Wilkie Memo.  Instead, it found that Mr. Kraja's one-time use of marijuana "greatly outweighed any positive aspects" of his service record.  Ex. A at 3.  Additionally, the BCNR's decision made no mention of the post-discharge factors the Wilkie Memo requires it to consider to determine whether relief is warranted.

84.     The BCNR also ignored Mr. Kraja's argument that the timing of his discharge (before PTSD screening mechanisms were in place) put him at a distinct disadvantage and led to the Navy's failure to consider his PTSD symptoms as mitigating factors at the time of discharge. The decision does not mention or attempt to refute this contention whatsoever.

16

85.     Mr. Kraja has been damaged by the BCNR's refusal to upgrade his Character of Service to "Honorable" and its refusal to amend his narrative reason for separation, separation authority, and separation code.

86.     Mr. Kraja is ineligible for certain benefits offered by the Department of Veterans Affairs that are reserved exclusively for service members with a fully Honorable discharge.

87.     Mr. Kraja is ineligible for state benefits for veterans with an "Honorable" discharge status, such as local property tax exemptions and certain scholarships.

88.     Mr. Kraja is negatively stigmatized by his "General (Under Honorable Conditions)" discharge status, as compared to an "Honorable" status, and by the statement on his DD 214 that he was discharged for "Misconduct – Drug Abuse," and it brings him great shame.

89.     Mr. Kraja seeks an order vacating the BCNR's decision, remanding the order to the BCNR, and directing the BCNR to upgrade Mr. Kraja's Character of Service to "Honorable," his narrative reason for separation to "Secretarial Authority," and his separation code, and separation authority, to entries reflecting Secretarial Authority.

<strong>CLAIMS FOR RELIEF</strong>

**First Claim for Relief – Violation of The Administrative Procedure Act, 5 U.S.C. § 706**

90.     The allegations of Paragraphs 1-89 are incorporated by reference as if fully set forth herein.

91.     Defendant's denial of Mr. Kraja's application for discharge upgrade is a final agency action.

92.     Defendant failed to apply binding agency guidance as directed by the Hagel and Kurta Memos by failing to give "liberal consideration" to Mr. Kraja's contention that his PTSD

17

diagnosis and symptoms were mitigating factors for the conduct that led to his discharge from the Navy.

93.    Defendant failed to consider the additional factors evidenced in Mr. Kraja's application, as required by the Wilkie Memo.

94.    Defendant failed to consider the inherent unfairness of the timing of Mr. Kraja's discharge as compared to service members discharged under today's regulations, which mandate screening for PTSD pre-discharge.

95.    Defendant's failure to adequately apply the guidance set forth in the Hagel, Kurta, and Wilkie Memos and its failure to provide a decision demonstrating a rational connection between the evidence presented and the facts found is arbitrary, capricious, an abuse of discretion, and not in accordance with the law, thus compelling its decision to be set aside pursuant to the Administrative Procedure Act, 5 U.S.C. § 706(2)(A).

<strong>PRAYER FOR RELIEF</strong>

WHEREFORE, Plaintiff respectfully requests that this Court grant the following relief:

a.    Order the Defendant to upgrade Mr. Kraja's discharge status to Honorable;

b.    Order the Defendant to change the narrative reason for separation to "Secretarial Authority" and to change his separation code and separation authority entries to those reflecting Secretarial Authority;

c.    In the alternative, hold unlawful and set aside the BCNR's decision, and remand to the BCNR for further review under the properly-applied "liberal consideration" standard;

d.    An award of reasonable attorneys' fees and costs to Plaintiff; and

e.    Such other relief as the Court deems just and proper.

18

Dated: July 14, 2026
Hartford, CT

Respectfully submitted,

By:   _/s/ Sarah E. Dlugoszewski_
     Sarah E. Dlugoszewski (ct30292)
     Elizabeth H. Buchanan (ct31230)
     SHIPMAN & GOODWIN LLP
     One Constitution Plaza
     Hartford, CT 06103
     Tel.: (860) 251-5000
     Fax: (860) 251-5099
     sdlugo@goodwin.com
     ebuchanan@goodwin.com

and

 _/s/ Alden Pinkham_
Alden Pinkham (ct31279)
Ali Walker-Burr (ct31872)
CONNECTICUT VETERANS LEGAL CENTER
114 Boston Post Road, Ground Floor
West Haven, CT 06516
Tel.: (203) 200-0119
apinkham@ctveteranslegal.org
awalker@ctveteranslegal.org

*Attorneys for Plaintiff Orgest Kraja*

19